## MELLETTE v. HUDSTAN OIL CORP.
### No. 4791.

Court of Civil Appeals of Texas.

April 25, 1951.

Rehearing Denied June 27, 1951.

Second Rehearing Denied Aug. 8, 1951.

Jack W. Frost, Cyrus B. Frost, Jr., Billy C. Frost, Virgil T. Seaberry and Turner & Seaberry, Eastland, Jones, Hardie, Grambling & Howell, El Paso, for appellant.

Hart Johnson, Fort Stockton, Hudson & Tomlin, Pecos, for appellee.

PRICE, Chief Justice.

This is an appeal from a judgment of the District Court of Crockett County, Texas, by F. D. Mellette. Mellette, as plaintiff, sued to recover from the Hudstan Oil Corporation, Defendant, a one-half interest in two certain oil and gas leases, the legal title to which stood in the name of said defendant company. The trial was to the court with a jury, but at the close of all the evidence the court instructed the jury to return a verdict in favor of defendant, and in pursuance of such instructed verdict, entered a judgment that the plaintiff take nothing. Plaintiff claimed an equitable title to an undivided one-half interest in two leases. One count was in the form of trespass to try title, another set up the facts relied on to establish the title asserted.

In this latter count plaintiff alleged in substance that in the latter part of 1947 or the first part of 1948, he made a contract with one T. S. Stanfield that he would point out lands in Crockett County wherein oil and gas was to be probably found. In the event that said Stanfield elected to drill on

same, Stanfield would at his expense acquire a lease or leases thereon and furnish the money for drilling as to such lease or leases; that plaintiff and Stanfield should be partners, each having an undivided one-half interest therein, and to share equally in any profit arising from the operations. By the way of inducement plaintiff alleged his extensive and accurate knowledge of oil land in Crockett County and the chances for production thereon; and further in pursuance of his agreement he pointed out to Stanfield various lands in Crockett County and explained to him the chances for production of oil thereon; further that acting on said information Stanfield and Hill D. Hudson secured from the Gulf Oil Corporation a farmout lease on part of said gas lease or leases covering among other land the sought 80 acres of the west ½ of Section 85 in Block OP, G. C. & S. F. Ry. Survey, Crockett County, Texas, subject to an overriding royalty of ⅛ of the full ⅝ reserved by Gulf. The working interest acquired was a three-fourths working interest; the assignment was taken in the name of Stanfield. By the lease Stanfield bound himself to drill certain wells and pay the drilling cost thereof; that certain wells were drilled at the cost and expense of Hudson and Stanfield; that Hudson took said interest in the farmout lease with notice of plaintiff's interest therein; that subsequently Hudson and Stanfield caused the said lease to be transferred to defendant; that the defendant was caused to be incorporated by Hudson and Stanfield; it was a closed corporation, Stanfield and his wife owning fifty per cent therein and Hudson and his wife owning the other fifty per cent; further that at the time said defendant took over the partnership assets Stanfield and Hudson each had notice of the interest held by plaintiff in the leases; that on or about April 20, 1949, Stanfield acting in his own behalf and as a partner of Hudson attempted to repudiate his contract with plaintiff; that the leases on September 15, 1949 were conveyed to defendant; that Stanfield was President of the defendant corporation and Hudson Secretary and Treasurer; that at the time of the transfer defendants had full notice of the rights of plaintiff in and to the leases and the defendant corporation holds one-half the title as a constructive trustee for plaintiff.

Defendant plead not guilty and general denial; the 4th Section of our Statute of Frauds, Art. 3995, V.R.C.S., and Art. 7425b–7, Vernon's Revised Civil Statutes, known as the Texas Trust Act.

██ Each party herein moved for summary judgment under Rule 166–A, Texas Rules of Civil Procedure. The trial court overruled the motion of each. In our opinion a denial of a motion for summary judgment is not a final judgment supporting an appeal. A motion for a summary judgment involves an application of law to the facts established as a matter of law; a judgment entered on an instructed verdict involves the application of law to the facts. If in favor of defendant it involves the finding that plaintiff's facts are insufficient to establish or put in issue facts necessary to sustain a judgment in his favor, it, the same as a motion for a summary judgment is in the nature of a demurrer to the evidence.

██ In passing on a motion to instruct the court must assume as true the evidence introduced by the opposing party and all evidence tending to establish his cause of action. There is perhaps this exception, which it is true has no application here— that the court is not required to assume as true facts shown by the record to be false or facts judicially known to be false.

The complaint of plaintiff charging error as to the court overruling his motion for summary judgment will be passed upon in the assignment charging error in sustaining the defendant's motion for an instructed verdict. At the close of all of the evidence the court should be able to judge as to whether or not a cause of action or defense had been established.

Defendant's motion for an instructed verdict in substance urged that the effect of the evidence of plaintiff was to establish a parol trust in land, which was barred by Section 4 of Art. 3995, R.S., the Statute of Frauds. Also invoked was Section /, Art. 7425b, known as the Texas Trust Act, declaring an express parol trust in land invalid; further because the evidence was too indefinite to

establish an enforceable trust in the lands in question; because the evidence failed to establish that defendant was not an innocent purchaser.

Plaintiff asserts that the evidence was at least sufficient to raise the issue of a constructive trust. Defendant urges that on the contrary the only tendency of plaintiff's evidence was to establish an express parol trust, barred by Section 7 of Art. 7425b. By Sec. 2 of this same Article, the Article has application only to an express trust.

■ Prior to the effective date of this Statute, either an express, resulting or constructive trust might be established by parol, but since the Statute an express trust may not arise by a parol contract or be evidenced thereby. Sections 2–7, Art. 7425b, Vernon's Texas Civil Statutes; James v. Fulcrod, 5 Tex. 512; Fitz-Gerald v. Hull, Tex., 237 S.W.2d 256.

■■ In determination of the issue as to whether the plaintiff was entitled to have the cause submitted to the jury, the evidence must be viewed most favorably to the plaintiff. The verdict was instructed against him. Stevens et al. v. Karr, 119 Tex. 479, 33 S.W.2d 725; White v. White, 141 Tex. 328, 172 S.W.2d 295. Authorities might be multiplied sustaining the above proposition. As has been stated before, a motion is in the nature of a demurrer to the evidence. The evidence in his favor for the purpose of passing on the motion to instruct must be assumed to be true.

A determinative and material issue on this appeal is as to whether or not the testimony raised the issue as to the existence of a constructive trust in favor of plaintiff to an undivided one-half interest in these leases. The alleged agreement beyond question was oral.

The farmout lease assigned by the Gulf Oil Company to Stanfield was in Stanfield's name only. It was assigned by Stanfield to the Hudstan Oil Corporation. There were two of these farmout leases and each was assigned by Stanfield to the Hudstan Corporation. The provisions of the two leases are practically the same, hence it is deemed only necessary to recite briefly the provisions of one of them. The assignment of the lease to Hudstan Company to the land in Section 85 recites that subsequent to the execution of the assignment to him Stanfield had caused wells to be drilled upon the said 80 acre tract which were producing wells and producing oil and gas in paying quantities. It recites as the consideration the sum of $10.00 and other good and valuable considerations paid to him by the Hudstan Oil Corporation, and the further consideration of the assumption by the Hudstan Oil Corporation of all the expenses, debts, claims and obligations owing by the said Stanfield for labor, material, pipe, and services performed upon the oil and gas wells drilled upon the aforesaid premises. It purports to convey all of the right, title or interest of Stanfield in the lease in question without warranty of title, express or implied. It recites that it was specifically understood that it was the intention of the assignor to transfer, convey, assign and set over to the Hudstan Oil Corporation all of his rights in the above described premises derived from and growing out of the said assignment and contract executed by assignor and the Gulf Oil Corporation. In the habendum clause it is provided that the assignor covenants that he is the owner of said lease and all rights created under the assignment between himself and the Gulf Oil Corporation. It is assumed throughout the briefs of the parties herein that Hill D. Hudson's title to the assignment of said lease from the Gulf Production Company was equitable only.

We assume, in passing on this appeal, that there is no question but what Hudson held an equitable title to one-half of the leases; that from the time that Stanfield obtained the farmout in question he and Hudson operated as partners and proceeded at great expense to the development of the lease, and after same was transferred by Stanfield to the Hudstan Corporation the Hudstan Corporation likewise proceeded with great diligence in the development of the lease, borrowing the sum of something like $300,000.00

The first two wells drilled on the assigned lease were drilled for Stanfield and Hudson by the plaintiff, and plaintiff was paid therefor by Stanfield, or said firm. Before contracting for the drilling of this

well plaintiff knew that Stanfield claimed he had no interest in the lease and repudiated in its entirety the contract plaintiff claimed existed between them. He did not inform Hudson of this.

Stanfield died prior to the trial and the filing of this suit. Defendant took the deposition of plaintiff and the plaintiff testified on the trial and likewise filed an affidavit in support of his motion for a summary judgment. The oral deposition of plaintiff appears in the statement of facts. But no part of same was offered in evidence. It was read as a qualification of plaintiff's bill of exception. In the deposition he testified that he was suing for an interest in the leasehold in the tracts of land involved, and he was also plaintiff in cause No. 991. He stated he claimed a half interest in the three tracts of land; that he based that claim "on *what* Mr. Stanfield came to my house to see me, he first came to the well where we were drilling on the north of town, and he stayed there one whole day waiting on me, and finally I came in late that evening, and I talked to him—and I had heard of him, and I knew where he was drilling a well. Then after that he let two or three days elapse and he came back—I didn't trade with him, and he came back, the next time he came to the house and we made the trade, just like you and I sitting here—made the trade that he and I would go fifty-fifty on that and show him where to drill the well"; that he showed Stanfield the three tracts of land, that he did this the latter part of 1947 or the early part of 1948, that his part under the contract was to show Stanfield where the oil was and Stanfield was to furnish somebody to drill the well and they were to go fifty-fifty; that Stanfield agreed to pay for the drilling of the well, nothing was said about the purchase price of the leases, he said he would get the leases and furnish the money to drill the wells with; that at the time of the conversation the witness knew who owned the land; that he never paid any of the purchase price for the lands; that he did furnish transportation; that under his contract he was not to pay any money, he was to show Stanfield where the oil was and he did that. In reply to the question

"When was he to deliver the title to you?" he answered "If I remember right, we went to Houston in the latter part of February or early part of March, maybe. And he came back in about two weeks; this was when he went to lease these leases."

In reply to the question "When, under your agreement, was he to deliver title to this land to you? A. Just as soon as he got it.

"Q. Before it was drilled? A. Sure; before it was drilled.

"Q. And was it the understanding that he was to take title in his name, and deliver you your half interest? A. He never said nothing about that.

"Q. There was nothing said about how the title was to be taken? A. No, sir.

\* \* \* \* \* \*

"Q. Now let's get it definitely as to that question: Your agreement with him—it was, as I understand your testimony, that he was to get the leases? A. He was to get the leases, and get the money to drill the wells with.

"Q. And you were to have one-half of what he got? A. That's right.

"Q. Do I understand your inference there, if you had to give somebody part of the lease to get it drilled, to get the money, you would get one-half of what Mr. Stanfield got? A. That's right.

"Q. In other words, if you have to call somebody in to finance the transaction, you were to divide with Mr. Stanfield what was left? A. I got a half interest with Stanfield.

"Q. You were to have half of the Stanfield interest? A. Well, there was nothing said about that.

"Q. What was the understanding about that? A. He was to get the money to drill the lease and get the leases, and I would show him where there was oil.

"Q. And did you understand at that time, that since he had to get the money, he had probably to give an interest for obtaining the lease and get the money to drill? A. He said he would not.

"Q. Did you at any time obligate yourself to pay any part of the purchase price

of those leases? A. It was not my trade with him.

\* \* \* \* \* \*

"Q. Your trade was that he was to furnish all the money necessary for obtaining them and drill or develop them, and you were to have a half interest? A. Yes, sir.

"Q. You were to have the same interest that he had—he was to have half of what was there, and you have the other half? A. Yes, sir.

"Q. Did he ever give you an assignment of any kind in this land? A. No, sir; only this verbal contract, like you and I, talking with you.

"Q. In other words, he never, at any time, executed any kind of instrument? A. No, sir.

"Q. Was there an agreement to give you an assignment? A. No, sir; he said we didn't need to do that; that we were both honest men and we didn't need a written contract."

Plaintiff further testified that prior to this contract about the lease he had never before done any business with Stanfield, there was no relationship between them; he had never talked to Mr. Hudson about his claimed interest in this land. He further testified: "Well, I guess I have got to start from the start. You didn't ask about that, but I will just tell you from the start. Mr. Stanfield went to Houston and got the lease, you see, and came back, and I was in McCamey, going to Crane on the highway, driving slow and met him, and he stopped me and he ran on up and I asked, 'Mr. Stanfield, what is the matter, what are you going to do?' and he says 'I am going to cut you out; you haven't got any money.' I says 'How do you know I haven't got any money?' and he said, 'I will give you the drilling contract of that lease down there and I could set you off forty acres interest in the eighty.' So the next day he went down there and told Bill Womack the same thing."

He further testified:

"My agreement with him, before I took him there, we would go fifty-fifty with the lease, before we ever went down there; that is all. After this, just a verbal con-

tract, it looked like, I said, 'Let's have a written contract'; and he said 'No, there wasn't any need of that; both of us are honest.'

"I was to show him where he could dig wells and get oil wells, and we would go fifty-fifty on the lease, his part was to get the lease and furnish the money to dig the wells."

Further plaintiff testified he showed Stanfield several thousand acres and he picked out the land in question as physically good, that his agreement applied to all the land he showed Stanfield if Stanfield got a lease on any of it. Various witnesses were tendered to show statements by Stanfield tending to show that he recognized that plaintiff had some interest in the leases. This was excluded on the objection that it was hearsay. None of the deposition was offered in evidence.

In his affidavit attached to his motion for summary judgment it was stated that during the month of December, 1947, some time near Christmas day, T. S. Stanfield came to his house in Crane. Stanfield told him that he had been informed that plaintiff had some information some potential producing property somewhere, and asked him if he would tell him where the property was—"I replied that I certainly would not." Stanfield left that day but returned within the next day or two; on the next visit Stanfield said that he wanted to make him a proposition, "he said that if I would give him the information about where the potential oil property was located, and further that if I would take him to see the property, then he and I would be partners on a fifty-fifty basis and it would be his part to furnish the money. I accepted his proposition and at that meeting or later we agreed that after the initial well was drilled then further development would be financed from the profits on the properties obtained by Stanfield under our agreement." That thereafter, in December 1947, the full twelve months of 1948 and the first two months of '49 Stanfield came to his home in Crane, Texas, approximately two dozen times. "On each of these two dozen times I accompanied him or he accompanied me on an automobile trip to Crock-

ett County, Texas, in Crockett County during this period we visited often and repeatedly the area surrounding Section 85, the locations on which the test wells I had scouted had been drilled around Section 85. On many of these occasions I took Stanfield to the exact spot where each of the test wells had been drilled. At the time I took him there there remained no visible evidence that a well had been drilled there, at each and every one of the locations I told Stanfield in detail exactly what the drilling operations had been in the test wells on those spots. There was at these visits not one offset or nearby well on any other property in these two areas. My last visit to these areas in Crockett County, Texas, with Stanfield was during the month of February, 1949, up to and including that time T. S. Stanfield had never indicated to me anything but the most intentional and delighted willingness to carry through the agreement we had made. In March '49 Stanfield came to where I was drilling and told me that he was on his way to Houston to get the farmout on Section 85 from the Gulf Oil Corporation. I told him that I would go with him, he replied that it was not necessary since we had agreed it would be his duty to obtain any leases. I did not insist on accompanying him. He further stated that on the 20th day of April, 1949, Stanfield repudiated the contract.

Assuming for the present that plaintiff's evidence was sufficient to raise the issue of a constructive trust, in our opinion it was insufficient to establish as a matter of law an interest in the property in question. All assignments complaining of the court's failure to sustain plaintiff's motion for a summary judgment or for an instructed verdict in his favor are hereby overruled. It seems to be agreed by the parties to this appeal that if the plaintiff's evidence raised only a claim founded on an express trust that the verdict under Article 7425b–1 et seq. was properly instructed against him.

■ Each of the parties to this appeal cites and to an extent relies upon the case of Fitz-Gerald v. Hull, Tex., 237 S.W.2d 256, 258; Hull v. Fitz-Gerald, Tex.Civ. App., 232 S.W.2d 93. In this case there is a discussion of the nature and character of express trusts, resulting or implied trusts and constructive trusts. We think for the decision of the instant case it is unnecessary to enter into these distinctions. Suffice it to say that an express trust ordinarily is an intentional creation, an implied trust by an imputed intention. A constructive trust arises independently of intention; it is ordinarily contrary to the intention of one of the parties. It is raised by equity to prevent the enjoyment of property rights acquired through inequitable conduct such as fraud or the breach of a fiduciary duty, and restore same to the defrauded party.

In Fitz-Gerald v. Hull, supra, plaintiffs, two employees of an oil company, agreed with defendant that in the event their employer, the oil company, did not desire leases on certain lands known as the Coble lands, that the defendant should seek to obtain leases thereon in the joint name of plaintiffs and defendant, plaintiffs to have a joint undivided one-half interest and defendant the other one-half interest in the leases. All expenses in obtaining the lease were to be equally shared and the parties were to develop same as joint adventurers. The trial court instructed a verdict in favor of defendant on the ground, we presume, that the contract testified to by the plaintiffs created an express trust. Not being in writing it was void and unenforceable by virtue of Art. 7425b. The case was appealed to the Amarillo Court of Civil Appeals, which reversed the judgment of the trial court and remanded the cause for new trial. Hull v. Fitz-Gerald, Tex.Civ.App., 232 S.W.2d 93. Justice Lumpkin wrote the opinion for the court. In substance it was held that the contract in question did not create an express trust. It was held that the purported agreement between the parties in question did not create a trust of any kind; that when Fitz-Gerald took title to the property in violation of his agreement with the plaintiffs that a constructive trust arose in their favor as to one-half of the property, if the relationship as alleged by plaintiff was shown to exist. The Supreme Court granted a writ of error, the judgment of the Court of Civil Appeals re-

versing the judgment of the trial court was affirmed.

Justice Griffin wrote the opinion for the majority, Justice Garwood a concurring opinion and Justice Smedley filed a dissenting opinion. In the majority's opinion it was held that the parol contract in question did not create an express trust, further that if the defendant took title to the property in his own name in violation of the parol contract, a constructive trust arose, this by virtue of the relationship of the parties, the relationship as we understand being that of joint adventurers; this assuming the testimony of plaintiff was true arose not by virtue of the contract but by virtue of the fiduciary relation existing. Justice Smedley, in his dissenting opinion, expressed the opinion that the contract as testified to by plaintiffs created an express trust and came under the condemnation of the Texas Trust Act, Sections 2 and 7, Art. 7425b; further that there was no such fiduciary relationship shown between the parties as would justify the raising of a constructive trust in favor of plaintiffs. Judge Griffin and Judge Smedley in their respective opinions each discussed the case of Kaiser v. Newsom, Tex.Civ.App., 108 S.W.2d 755, 759. (wr. dis. judgment correct). In the course of his opinion Judge Griffin said: [237 S.W.2d 264.] "The pleadings and proof show that the three parties agreed to enter into a joint adventure regarding this oil and gas lease and that each had a duty to perform to further the common interest. In carrying out this common interest each joint adventurer owed the highest duty to the other so to act as to further their joint interest, and each as to the subject matter of such joint adventure, was an agent of the other. The petitioner violated this duty in taking the title in his own name, and seeking to appropriate all the profits to his own use and benefit."

Judge Smedley in his dissenting opinion expressed the view that the parol contract as testified to between the parties did not constitute them joint adventurers, that is did not create an existing fiduciary relationship, it was merely an oral agreement that the parties would engage in a joint adventure if and when the lease was acquired.

In the opinion of the writer Judge Smedley's view is that conceding that the oral contract in question provided for an express trust that this would not prevent the raising of a constructive trust if the defendant took the title in his own name in violation of his duty as a fiduciary. He expresses the opinion, however, that there was no fiduciary relationship shown to exist between the parties. In support of his views as to the raising of a constructive trust he cites among other authorities the case of Mills v. Gray, 147 Tex. 33, 210 S.W.2d 985; Thompson v. Corbin, Tex.Civ.App., 137 S.W.2d 157. In Mills v. Gray, supra, Vol. 1, Sec. 44, p. 135, Restatement of the Law of Trusts is cited in support of the proposition that where there is a fiduciary relationship, even though there be a parol contract which but for the statute would create an express trust, that the transferee holds the property on the constructive trust (a) by the transfer, if secured by fraud, duress, undue influence or mistake, or (b) transferee at the time of the transfer was in a confidential relationship with the transferror. Cited likewise is 54 American Jurisprudence 178–233; Scott on Trusts, Vol. 1, 253, Sec. 44–22; Likewise 159 A.L.R. 1007, supplementing annotations in 35 A.L.R. 307; 80 A.L.R. 204 and 129 A.L.R. 695.

In the case of Mills v. Gray, supra, under a sort of family arrangement property had been conveyed to a member of the family under an oral agreement that he would make certain disposition thereof. It was held that under the testimony that the issue of a constructive trust was raised. If we understand the case of Fitz-Gerald v. Hull, supra, there was no dispute between Justices Griffin and Smedley as to the law on this point in case a fiduciary relationship was established between the parties. Justice Griffin was of the impression that such a fiduciary relationship was established, and title was taken in violation of the duty created thereby. Justice Smedley, on the other hand, believed no such fiduciary relationship existed under any of the evidence. It is

thought the basic difference between the views of the majority opinion and the dissenting opinion lies in the existence or non-existence of a joint adventure.

In our opinion one of the main determinative questions in this case is as to whether Mr. Stanfield agreed in substance with the plaintiff that if he succeeded in acquiring at his own expense an oil and gas lease on any of the property pointed out to him by the plaintiff as having oil or gas underlying same that plaintiff should have a half interest therein and Stanfield at his own expense should drill the first well thereon. Beyond any question there was evidence raising the issue that there was some sort of an agreement between the plaintiff and Stanfield that in pursuance of an agreement plaintiff took Stanfield to various points in Crockett County where he claimed that same had been successfully tested, where the test showed oil and gas. Beyond any question there was evidence raising the issue that the area included in the farmout leases acquired from the Gulf Production Company was on land so pointed out by the plaintiff.

There is evidence raising the issue that prior to the acquisition of the lease in question by Stanfield that plaintiff over a considerable period of time, in pursuance of an agreement with Stanfield, had taken him to the land in Crockett County where according to his best information by drilling oil and gas could probably be developed.

■ Posed by this appeal is a question as to whether or not the evidence was sufficient to raise the issue of a partnership or joint adventure between plaintiff and Stanfield at the time Stanfield acquired the leases in question. If the issue as to the existence of either of the relations was raised the direction of the verdict was error. If the existence of neither was raised by the testimony then the direction of the verdict was correct. Their relationship depends on the contract, if any, existing between them. In regard to this the only testimony admitted was the oral testimony of plaintiff given from the stand on the trial. It is elementary that the propriety of a court instructing a verdict in favor of a party must depend on the evidence in-

troduce before the jury. The action can not be assailed on the ground that the party could have offered testimony entitling him to have his alleged cause of action submitted to the jury. Rejected testimony can not be considered in passing on this issue. Complaint as to the rejection of the testimony is another matter. Avowals as to what was expected to be the testimony of a witness not permitted to answer the questions is not testimony. A showing by the witness of what his testimony would be is not a substitute for the testimony tendered. We have stated in substance the statements made by plaintiff in his affidavit in support of his motion for summary judgment; likewise have stated the substance of his deposition taken at the request of defendant and filed in the case, not because such testimony is deemed pertinent, not because it has any bearing on the issue now being considered. Although it will perhaps unduly lengthen this opinion we shall reproduce the vital parts of plaintiff's testimony before the jury:

"Q. Did you ever do any drilling in Crockett County? A. I have.

"Q. When was that? A. In 1946.

"Q. Who did you work for? A. Addison Drilling Company.

"Q. Where? A. Out of Midland; their main office is in Tulsa.

"Q. What part of Crockett County did you work in? A. About eight miles this side of Plymouth Hill on the Plymouth lease.

"Q. How far is that lease from Section 85? A. About twenty-five miles.

"Q. By the way, what did you do from 1941 to 1945? A. I worked at the defense plant.

"Q. At Oak Ridge, Tennessee? A. I was there.

\* \* \* \* \* \*

"Q. Have you done any contracting on your own since that defense work at Oak Ridge, Tennessee? A. Yes, sir.
\* \* \*

\* \* \* \* \* \*

"Q. Are you contracting now? A. Yes, sir.

"Q. Where? A. Out here on Section 85 in Crockett County.

"Q. Where are you working now? A. In Mitchell County.

"Q. The county in which you live? A. Yes, sir.

"Q. When were you first employed by the Addison Drilling Company of Midland? A. In 1946.

"Q. How long did you work for them? A. Until this year—the 20th of January.

"Q. What was the character of your work for the Addison Drilling Company? A. Pushed tools for about nine months, and then looked after rigs.

"Q. How many rigs did you run? A. I ran one of theirs.

"Q. For the Addison Drilling Company? A. I was drilling up here at the Plymouth Company.

"Q. Drilling a well on contract? A. Yes, sir.

"Q. Do you know Mr. Womack, who has just gone off the stand? A. Yes, sir.

"Q. How long have you known him? A. About twenty-five years.

"Q. Where did you first know him? A. At Baird, Texas.

"Q. Did you see Mr. Womack at any time when you were drilling the Plymouth well in Crockett County? A. Yes, sir.

"Q. Where did you see him? A. He came to the well.

"Q. Do you know about when that was? A. That was along in August of 1946.

"Q. How long were you on that Plymouth well? A. I drilled four wells on the Plymouth lease; I started in June and finished up in January, I believe, of 1947.

"Q. Where did Mr. Womack work at the time he came over there? A. He was working not too far away.

"Q. What kind of oil field work were they doing? A. Drilling test holes.

"Q. Did you or not ever go to the place he was drilling the test holes on? A. Yes, sir.

"Q. Did you or not have instructions from your company to scout any work he was doing? A. I did.

"Q. Who gave you the instructions? A. T. R. Parker.

"Q. What position did he hold with the Addison Drilling Co? A. He was president of the drilling outfit.

"Q. What did you do in scouting those wells Mr. Womack was drilling? A. I would go around and talk to him about them and look at them.

"Q. What kind of outfit did he use in drilling those holes? A. It was a Fort Worth spudder.

"Q. He started with what? A. A ten-inch hole and ran casing in those holes with an eight or nine—under 8/5/8.

"Q. When you were scouting the test wells, did you see any scouts of any other oil company around there? A. No, sir.

"Q. How many times were you around the test holes that were being drilled? A. A lot of times, I was around through the field.

"Q. As I understand, this rig was being used with coupling poles? A. Yes, sir.

"Q. What did they do with the stuff they brought up out of the hole? A. Dumped it in the slush pit.

"Q. Did you see any dumped in the slush pit from those holes? A. Yes, sir.

"Q. How many slush pits did you examine around the test holes? A. That would be hard to say; lots of them.

"Q. Did you ever know a man by the name of T. S. Stanfield? A. I did.

"Q. Did you know T. S. Stanfield when you were over at the test wells that Mr. Womack was drilling? A. I did not.

"Q. When did you first meet T. S. Stanfield? A. In the early part of 1948.

"Q. At that time, where were you living? A. At Crane.

"Q. Were you there with your family? A. Yes, sir.

"Q. What work were you engaged in? A. Drilling wells.

"Q. For whom? A. For Skimmerhorn.

"Q. At that time, the first time you saw Mr. Stanfield, were you working for the Addison Drilling Company? A. Contracting.

"Q. Were you working for or as an employee of the Addison Drilling Company? A. I was not contracting for it.

"Q. You were not working as an employee? A. No, sir.

"Q. In the early part of 1948 was Mr. Parker still with the Addison Drilling Company? A. Yes, sir.

"Q. Where did you first see T. S. Stanfield? A. He came to the rig floor and waited until after dark and finally he came to town and I found him in Crane.

"Q. In what part of Crane did you live? A. In the central part.

"Q. Did you or not have a conversation with him in town or in your home? A. The first one was in town.

"Q. Did you have a conversation with him at any later date? A. Yes, sir.

"Q. Where was that? A. At the house; at my home. There in Crane.

"Q. Was that conversation you had in your home, was it day or night? A. In the day time.

"Q. Do you remember anybody present except you and T. S. Stanfield? A. I do.

"Q. Who was that? A. My wife.

"Q. Is she still living? A. Yes, sir.

"Q. Did you have any children at home? A. No; I have one daughter, but she is married.

"Q. And in Cisco? A. Yes, sir.

"Q. Mr. Mellette, when Mr. Stanfield came to see you was anybody with him? A. No, sir.

"Q. Did a man named Walter Francisco ever come with Mr. Stanfield to see you? A. No, sir.

"Q. Did you ever know a man by the name of Walter Francisco? A. Yes, sir.

"Q. Did you have a conversation with Mr. Stanfield in Crane before he went to your house the next day? A. Yes, sir.

"Q. Tell the jury the substance of the conversation had between Mr. Stanfield—what you said and what he said in Crane, at your first meeting?"

Here there was objection interposed by the defendant, but same was overruled.

"Q. Tell the conversation now that you had with Mr. Stanfield; not what you thought or he thought, but as you remember what he said and you said the first night in Crane? A. He just came to Crane, and said he had missed me when he came to the lease, and Mr. Stanfield said Walter Francisco sent him and said I had some shallow production; and he said, 'I will be back tomorrow.'

"Q. Was anybody present? A. No, sir.

"Q. Do you remember what kind of a car he was driving? A. A Chevrolet.

"Q. What kind were you driving? A. 39 Ford.

"Q. What part of Crane—just exactly the place—did that conversation occur? A. Three blocks west of the first green light going north from the south in Crane.

"Q. What was there? A. Right in the street.

"Q. How long were you together on that occasion? A. I would say fifteen minutes.

"Q. Did you see him later? A. He came to my home.

"Q. Later? A. Yes, sir.

"Q. What time, with reference to the first meeting? A. Three or four days previous.

"Q. Previous or later? A. I mean later.

"Q. Did you have a conversation with him? A. I did.

"Q. That was in your home? A. Yes, sir.

"Q. Was that day or night? A. In the day time.

"Q. As near as you can tell, Mr. Mellette, not what you thought or what he thought, what was the substance of what was said? A. He wanted to know if I knew where he could get some shallow production, and I told him I did. Well,

when can we go down; and I said 'Mr. Stanfield, we will have to have a written contract;' and he said, 'No, we are both honest men.' So that was the only offer we made at that time.

"Q. How long did he talk with you on that occasion? A. At that time?

"Q. Yes, sir. A. He probably stayed there two hours.

"Q. Did you mention in the conversation the County in which the shallow production was located? A. Yes, sir.

\* \* \* \* \* \*

"A. I told him it was in Crockett County; and he wanted to come down, and I brought him down. He wanted to know in the particular part of the county, and I told him in the northeast and southeast part.

"Q. What other matters were discussed? A. He wanted me to get a map and show him on the map, and I did.

"Q. What kind of a map did you have? A. I have an oil field map.

"Q. A little or a big one? A. It was a large one.

"Q. What did you do about showing him with the map? A. I showed him where it was on the map, and brought him down here.

"Q. Did anything else happen in the conversation that day that you are talking about at the house? A. I can't remember anything to amount to anything.

"Q. Did you ever go down to Crockett County with him? A. I did.

"Q. How long after that last conversation? A. About four days.

"Q. Where did you start from? A. Started from Mr. Womack's house.

"Q. Where did Mr. Stanfield live at that time? A. At Monahans.

"Q. Did he come by Crane and get you? A. He always came by Crane.

"Q. Coming to his house? A. Yes, sir.

"Q. What were you doing at that time? A. Drilling oil wells.

"Q. Were you on a salary? A. No, sir.

"Q. Contracting? A. Yes, sir.

"Q. Where did you and Mr. Stanfield go on the first trip to Crockett County? A. To Mr. Womack's house.

"Q. Who was present? A. Mr. Womack and his wife.

"Q. Did you and Mr. Stanfield have a conversation with Mr. Womack in Mr. Womack's presence in his house? A. Yes, sir.

"Q. What was said by each to him? A. He told Mr. Womack if he got a lease out there where he told us we could get oil, we would take care of him in the lease; he would get the drilling of some wells.

"Mr. Hudson: We object to that statement as being purely hearsay as far as this defendant is concerned.

"Court: In the state of the record now developed, it will be sustained, and the answer to the last question is stricken from the record.

\* \* \* \* \* \*

"Q. Did you and Mr. Womack and Mr. Stanfield ever go out near where those test holes had been drilled? A. Yes, sir.

"Q. Who, if anyone, requested you to go? A. Mr. Stanfield.

"Q. What did you do when you got out there? Don't tell what was said, but what did you three do? A. We drove up to a test hole—one here, one here, and one there—and looked at them and talked about them, and took the map out.

"Q. Did you have a map along with you? A. Yes, sir; always.

"Q. What evidence was there on the ground at that time when you and Mr. Womack and Mr. Stanfield went to that test hole that had been drilled at the same spot? A. No evidence whatever; only a little water line or a little road with tracks going in and out; no line made by a little slush pit.

"Q. What was the condition of the slush pit? A. It was covered up.

"Q. On how many occasions did you and Mr. Womack and Mr. Stanfield go to the test wells? A. That is hard to say; a lot of times.

"Q. About how many? A. I would say a dozen or more.

"Q. In how long a period of time? A. Twelve months.

"Q. At the time you and Mr. Womack and Mr. Stanfield went on that first time, was there any producing oil well in that vicinity? A. No, sir.

"Q. What was the first producing oil well that came in anywhere in that vicinity? A. Down southwest of Section 85.

\* \* \* \* \* \*

"Q. Did you or not make a trip to Houston or Fort Worth with Mr. Stanfield to see any official of the Gulf? A. No, sir; he didn't want me to go. I offered to go and he said he didn't need me.

"Q. Did you see him when he came back? A. I didn't for two weeks or more.

"Q. Did you see him then? A. I saw him going around a lot. One time he came to McCamey and coming out toward Crane he bumped me in the back and stopped, and first told me to get over \* \* \*".

The Court sustained defendant's objection to this question.

"What did he do? A. He came up behind the car and started to say—

"Q. Don't tell what was said; he came in on the left side and then you got over? A. I got over.

"Q. How did he look on that occasion? A. He was white as a sheet.

"Q. Did he or not make a statement to you on that occasion with reference to whether or not you would participate in the first eighty acres—

"Mr. Hudson—We make the same objection to that.

"Q. Did he make a statement to you? A. Yes; he did.

"Q. What statement did Mr. Stanfield make to you at that time and place, as you and he sat there in the car on the road between McCamey and Crane?"

The objection of defendant to this question was sustained.

"Q. Mr. Mellette, did you drill any wells on Section 85? A. I drilled two.

"Q. Under contract? A. Yes, sir.

"Q. How much were you to be paid? A. Four dollars a foot.

"Q. What did you furnish? A. Drilling rig to drill the hole.

"Q. Have you ever received any assignment or lease? A. No, sir.

"Q. Have you been paid for drilling the two wells? A. Yes, sir."

Here the jury was retired, and for the purpose of plaintiff's bill as to the exclusion of his testimony plaintiff was examined by his counsel at some length. In the absence of the jury for the purpose of the qualification of the bill, or it was so stated, he was very thoroughly cross-examined by counsel for the defendant. While the jury was retired he was examined further by his counsel. As we understand the contention of plaintiff is that the contract relied upon was made at the town of Crane, present plaintiff and his wife and Stanfield. There was no objection sustained to plaintiff's telling all about what his version of this contract was. Subsequent to the contract relied upon plaintiff took Stanfield over a large area in Crockett County, pointed out to him where in his opinion oil could be obtained if drilled. Subsequently Stanfield obtained a lease on a part of the area pointed out by plaintiff. Stanfield caused same to be drilled after obtaining the lease and oil in paying quantities was discovered. The testimony of plaintiff above quoted indicates there must have been some sort of agreement between Stanfield and plaintiff in regard to locating land and indicating the probabilities of discovering oil thereon. The actions of the parties as testified to by the plaintiff indicate this. The terms of such agreement or contract are not definitely shown by the testimony of plaintiff. Plaintiff's testimony as to the terms of the alleged contract failed to show in any respect the terms thereof. He was asked by his counsel questions suitable to develop his version of the terms of the contract but his response failed to disclose his theory as to what they were. One relying on establishing a trust for his benefit in property must establish same by clear and convincing evidence. Neill v. Keese, 5 Tex. 23; King v. Gilleland, 60 Tex. 271; Jones et al. v. Siler,

129 Tex. 18, 100 S.W.2d 352; Clayton v. Ancell, 140 Tex. 441, 168 S.W.2d 230.

It inherently appears from the testimony of plaintiff that his testimony as to the trust alleged is lacking in this quality; the court correctly instructed the verdict in favor of defendant.

 Complaint is made as to the exclusion of the testimony of the witness Womack that at a time subsequent to the making of the alleged parol contract plaintiff brought Stanfield to the house of Womack and asked Womack to tell him where they could get acreage they could get a well on; that Womack told him where he thought they could get some acreage where they stood a good chance to get a well and that place was in Section 85, and he further told Stanfield and plaintiff that his information was based on test holes he had drilled, and told him where the test holes were; that he had never seen Mr. Stanfield before that time he was there with the plaintiff.

This question in aid of the bill was asked the witness Womack:

"Q. Did either one tell you why they were there, as far as the relation between them was concerned? A. Well, they—I understood them, when and if they got the acreage and got some wells, they would be in partners on the deal.

"Q. Did someone tell you that—either one? A. Both of them.

"Q. On the first occasion when they came to your house? A. Yes, sir."

It was established, we think, without dispute that plaintiff escorted Stanfield over various portions of Crockett County. The vital portion of the testimony was that each told him and we presume each in the presence of the other, that when and if they got the acreage and got some wells they would be in partners on the deal.

There is complaint of the court excluding testimony of the plaintiff Mellette as to this same conversation between the witness Mellette, Stanfield and the witness Womack. The plaintiff Mellette was asked this question: "Q. What was said by each to him? A. He told Mr. Womack if he got a lease out there where he told us

we could get oil we would take care of him in the lease, he would get the drilling of some wells."

Defendant objected to the testimony on the grounds that same as to defendant was hearsay. The court sustained the objection and struck the testimony. Now there was no occasion for plaintiff's counsel to make an avowal as to what was expected to be developed. The witness replied to the question and the court struck the reply out. Plaintiff's counsel for the purpose of his bill interrogated the witness at great length. Among other matters the witness stated: "Mr. Stanfield and myself went over to Mr. Womack's house and got Mr. Womack and I made him acquainted with Mr. Stanfield and he said 'Mr. Womack, Mr. Mellette tells me there is some oil out there, do you know anything about it?' and he said he did. He said: 'Will you show me where it is?' and he said 'I will'. Mr. Stanfield and myself told Mr. Womack we would take care of him and he said 'When can you go, Mr. Womack, to the lease' and Mr. Womack said 'Some time in the near future'."

Further he stated: "He told Mr. Womack (referring to Stanfield) I told Mr. Womack we would take care of him that he would go and get a lease and would drill and we would be 50/50, I and Mr. Stanfield."

Had this evidence been admitted and Womack's evidence as to this conversation, in the absence of admissible evidence as to the terms of the contract between plaintiff and Stanfield we do not think it would have established a cause of action in favor of plaintiff. The question would still remain: What was the contract between plaintiff and Stanfield?

 Defendants claim that it appears from the evidence as a matter of law that it is a bona fide purchaser of the leases in question, that is, it paid value therefor without notice of the claimed equity of plaintiff. Here plaintiff asserts an equitable title. Such being the case, the burden was upon him to show as against the legal title that the defendant either did not pay value or purchased with notice of his asserted equity. Teagarden v. R. B. Godley

Lumber Co., 105 Tex. 616, 154 S.W. 973; Murphy v. Johnson, Tex.Civ.App., 54 S.W. 2d 158, loc. cit. 163; Gillian v. Day, Tex. Civ.App., 179 S.W.2d 575, (Writ refused).

By the same token Hudson is not entitled to protection as a bona fide purchaser. So far as the record goes the title of Hudson was only an equity. This being the case he took the title as it was and is not entitled to protection on the ground he was a bona fide purchaser. Yorks Adm'r v. McNutt, 16 Tex. 13, 14; Thompson v. Corbin, Tex. Civ.App., 137 S.W.2d 157 (No writ history).

However, as we understand it the only title acquired from Hudson was by the deed from Stanfield. Stanfield's relationship to Hudson was that of a partner. The leases in question appear to have been the sole assets of the partnership. In our opinion Stanfield's knowledge of plaintiff's alleged right in the leases is to be imputed to Hudson. Furthermore, the defendant was formed for the purpose of holding these leases. It held them subject to the same trust, if any, that could be urged against the partnership. Lavaca Petroleum Corp. v. Runk, Tex.Civ.App., 111 S.W.2d 1113, (App. for wr. of error dismissed by agreement).

In our opinion the evidence was sufficient at least to raise the issue that defendant was not a bona fide purchaser and the action of the court in instructing the verdict cannot be sustained on that ground.

We affirm the case solely on the ground of insufficient evidence to establish a constructive trust. The relationship of the parties was by virtue of a contract the plaintiff failed to show the terms thereof.

## On Motion for Rehearing

Careful and painstaking consideration has been given to appellant's motion for a rehearing. In the consideration of this motion we have considered plaintiff's deposition, which was neither introduced in evidence nor offered in evidence. Likewise we have considered the testimony tendered by appellant to which objection was sustained. We have reached the conclusion had the deposition and other testimony been admitted the result must have been the same.

The title appellant asserts herein has as its basis an alleged oral contract between him and Stanfield, one of the defendant's predecessors in title. This contract, according to the version of appellant, was that appellant was to locate the oil land, Stanfield to obtain a lease or leases and to drill the first well at his own expense. Stanfie'd and appellant, as expressed by plaintiff, were then to be "fifty-fifty". This term appellant construes, not without some reason, as a contract to become partners, or joint adventurers, as to the lease or leases. The most liberal construction of appellant's testimony his deposition and the rejected testimony does not raise the issue that Stanfield was to take title to the lease or leases in their joint names. The leases acquired imposed obligations on Stanfield; he was to reimburse assignor for taxes paid and to be paid; there was a conditional limitation in the leases unless rather extensive and expensive development was commenced within sixty days the leases expired by their own limitation. In order to recover this property appellant must rely on the alleged oral contract. If the court cannot enforce this contract, from what source does the alleged obligation of Stanfield arise to drill the well at his own expense?

One of the basic constituents of a constructive trust is restitution—restitution of the property of the cestui que trust with which the property, the subject of the trust, has been acquired. The only thing that could give him a right in this property was the oral contract, according to his testimony. For his services he was to receive one-half of the property which was to be acquired by Stanfield. Under his testimony we think it was contemplated that the title was to be taken in the name of Stanfield, one-half of same to be held for the use and benefit of appellant. If this be correct we have an express trust, which appellant can not assert by reason of Section 7 of Article 7425b of the Texas Trust Act. If this is not and proper construction, of the parol contract between appellant and Stanfield, then we have a case where Stanfield orally agreed to convey to appellant a

half interest in the property when same was acquired. This would be barred by the Statute of Frauds, Sec. 4, Art. 3995, V.C.S.

Appellant's conduct was at variance with his contentions herein. He drilled the first two wells on the premises as an employee of Stanfield and Hudson. The purpose of this drilling was not to discharge any of his obligations under the lease, but to discharge and preserve Stanfield's or Stanfield and Hudson's rights under the lease. However, this properly goes to the weight of his testimony, rather than to the merits of the case.

It is ordered that appellant's motion for a rehearing be in all things overruled.

### On Appellant's Second Motion for Rehearing

In a second motion for rehearing appellant complains that we failed to rule on points of error 8, 9, 10, 11, 12 and 13. We think we have ruled thereon, by implication in any event, in the main opinion and the opinion on rehearing. However, to the end that there be no misunderstanding about the matter, the said points of errors are each specifically overruled as not presenting either severally or jointly reversible error.

It is ordered that appellant's second motion for a rehearing be in all things overruled.