**HOWARD v. O'NEAL et al.**

**No. 2911.**

Court of Civil Appeals of Texas. Eastland.

Feb. 1, 1952.

Rehearing Denied Feb. 22, 1952.

Joe H. Jones, Dallas, for appellant.

Golden, Croley & Howell and Mays & Lea, all of Dallas, for appellees.

LONG, Justice.

W. E. Howard instituted this suit against John T. O'Neal and H. R. Randall for an accounting, dissolution of an alleged partnership or joint adventure and a division of the partnership property. At the conclusion of plaintiff's testimony, the court granted defendants' motion and peremptorily instructed the jury to return a verdict in their favor. Judgment was rendered thereon in favor of defendants, from which plaintiff has appealed.

Appellant alleged that on or about February 1, 1950, he entered into an oral agreement with Randall and O'Neal to pool their time, services, best efforts and money to acquire, develop and operate oil, gas and mining leases on lands in Stonewall County for profit; that the parties agreed that the title to the leases would be taken in the name of O'Neal and that an undivided one-

third interest in all leases so acquired would be held in trust by O'Neal for the benefit of appellant. Appellant further alleged that O'Neal would furnish all monies necessary for purchasing the leases and that a plan would be worked out whereby a portion of said leases would be sold for a sufficient sum of money to reimburse O'Neal and then said joint adventure would be owned and operated by the said O'Neal, Randall and Howard, each owning an undivided one-third interest therein; that in pursuance of said agreement, O'Neal acquired an oil and gas lease covering approximately 1,700 acres of land in Stonewall County from Eugene Goodrich; that thereafter, O'Neal obtained from Sinclair Oil Company and Union Oil Producing Company and others, dry hole letters and bottom hole purchase letters, agreeing to contribute certain amounts if a well was drilled upon said lease and the same was not a producer; that a well was drilled upon said land which was a dry hole and that by reason of the dry hole letters, O'Neal made a profit upon said undertaking. Appellant prayed that appellees be compelled to file a sworn statement showing all the oil, gas and mining leases, farm-outs, contracts, contribuuons and purchase letters and working agreements and all other mineral interests acquired on land in Stonewall County, Texas, since February 2, 1950, and also for a showing and accounting of all assignments, contracts to assign made, to whom made and on final hearing, an accurate accounting be had of the assets of the partnership or joint adventure and a dissolution of the partnership and that his one-third interest therein be established and that he have judgment for his interest in the partnership property. Appellees' motion for a peremptory instruction was based upon the following grounds:

"1. That the pleadings and evidence of plaintiff show an express trust, and being based on an oral contract is prohibited by Section 7 of Art. 7425b of the Revised Civil Statutes of Texas;

"2. That the agreement established by plaintiff's evidence, being oral, was wholly lacking in mutuality and precludes any issue of fact upon which a valid contract could be based and such a valid and binding enforceable contract is a necessary requisite to the establishment of a parol trust in land under the provisions of Article 3995 of the Revised Civil Statutes;

"3. Plaintiff's evidence fails to raise any issue of facts as to the existence of a confidential relationship between plaintiff W. E. Howard and defendant John T. O'Neal, such confidential relationship being an essential element of a cause of action to impose a constructive trust upon the legal title and that plaintiff's failure in this regard forecloses any recovery by him;

"4. Because the agreement as shown by plaintiff's evidence violates the rule against perpetuities;

"5. Plaintiff's evidence shows an agreement which is against public policy of this state and unenforceable in its courts because plaintiff led Eugene Goodrich to believe he, plaintiff, was at all times acting as an agent for Eugene Goodrich in securing a purchaser for the Stonewall County leases which John T. O'Neal purchased."

Appellant contends the trial court erred in peremptorily instructing the jury to return a verdict in favor of appellees. As we view the case, it will not be necessary for us to discuss each of the grounds set out in appellees' motion for an instructed verdict. It will be noted that the first ground given is "that the pleadings and evidence of plaintiff show an express trust, and being based upon an oral contract is prohibited by Section 7 of Article 7425b of the Revised Civil Statutes of Texas." Prior to the enactment by the 48th Legislature in 1943 of Article 7425b, Section 7, Vernon's Annotated Revised Civil Statutes of Texas, our courts recognized that a parol trust in real estate was valid if the oral agreement upon which it was predicated was entered into prior to the acquisition of the legal title by the trustee. However, since the enactment of the above statute, our courts have uniformly held that an express trust resting in parol cannot be enforced.

Article 7425b, Sec. 7, contains the following language:

"Provided, however, that a trust in relation to or consisting of real property shall

be invalid, unless created, established, or declared:

"1. By a written instrument subscribed by the trustor or by his agent thereunto duly authorized by writing;

"2. By any other instrument under which the trustee claims the estate is affected."

■ Appellant contends that his claim to the oil and gas leases and other property is not based upon an express trust but that the evidence shows a constructive trust. It is a settled law that a constructive trust is not inhibited by the above Article and that a parol agreement based thereon may be enforced. Fitz-Gerald v. Hull et al., Tex. Sup., 237 S.W.2d 256.

We have concluded from a close study of the evidence that appellant failed to show that he had an interest in the oil leases under either an express trust or a constructive trust. In other words, the evidence fails to establish a trust of any kind.

We have concluded that the second ground of the motion for an instructed verdict filed by appellees, reading as follows, "that the agreement established by plaintiff's evidence being oral was wholly lacking in mutuality and precludes any issue of fact upon which a valid contract could be based and such a valid and binding and enforced contract is a necessary requisite to a parol trust in land under the provisions of Article 3995 of the Revised Civil Statutes," is correct and should be sustained. The evidence shows that appellant Howard, in February, 1951, and for a number of years, had been engaged in the oil business and held a broker's license; that prior to that time he had dealings with appellee Randall and that about ten years prior thereto, he had filed a suit against Randall similar to the one here. He was acquainted with O'Neal but had never had any business transactions with him except perhaps had interceded in a controversy that O'Neal had had with another party. In January, 1949, Eugene A. Goodrich was the owner of 1,700 acres of leases in Stonewall County and needed to raise $3,500. He contacted Howard with reference thereto and Howard informed him that he might be able to assist him. Howard communicated this information to Randall, telling him that Goodrich was a friend of his and that he owned 1,700 acres of leases in Stonewall County and was "in a bind" for cash. The next morning Howard had a conversation with O'Neal with reference to these leases and we here deem it wise to quote from the testimony of appellant with reference to the agreement he had with O'Neal at that time, which testimony is as follows:

"Q. You got together the three of you, John O'Neal, Harry Randall and Mr. Howard, is that right? A. Yes, sir.

"Q. That's right. A. Yes, sir.

"Q. All right, who opened up the conversation? A. Well, I don't know, verbatim. I talked with O'Neal, of course, and he had his usual good grin on. He said, 'How are you feeling, Bill?' I said, 'All right.' He said, 'Harry tells me you got a pretty good deal here.' That was about the substance of the opening conversation on that occasion.

"Q. And that is when this partnership was born, right there? A. We discussed it and the map was opened on Mr. Randall's desk, and John said, 'Let's take a look at it.' He didn't know the acreage, but he knew the vicinity approximately, and Harry and John said, 'It looks all right, looks good.' John said, 'Harry has been telling me about this deal, what do you think it's going to cost to get this acreage?' I said, 'John, I don't know what it's going to cost, all I know is the man needs some money and he's got this acreage and I believe a good deal can be made with him.'

"Q. Did you discuss the details of this partnership then? A. Yes, we discussed it right then and there.

"Q. What were they? A. That this deal was—I was to bring Mr. Goodrich into the picture and into our conversation and we were to determine just what it would cost to take those leases. If the price and details were satisfactory to Mr. O'Neal, then he would agree to be the financing man in the deal. He would put up the necessary moneys, see, to acquire the deal. We were all of us to use our best efforts to promote our so-called

general welfare, either selling at a profit or getting a well drilled, or doing something, so that the money would not be sacrificed, and if, as and when that was completed, then whatever profit we made was to be divided equally between the three, one-third, one-third and one-third of the profits, whether it was acreage or money or what, it made no difference.

"Q. How about losses, did you discuss any losses? A. No, sir; we didn't discuss any losses, because we never anticipated any losses. We didn't know how much it was going to cost.

"Q. You were not to pay any of the losses? A. It wasn't discussed. If it had been discussed, I would have been glad to.

"Q. Just profits discussed? A. That's the way to approach a deal. You don't go into a deal with a negative idea and say, 'We are going to lose some money, let's go into it.

"Q. You were going to have to have the dough for drilling a well? A. Yes, sir.

"Q. That was discussed? A. Yes, sir.

"Q. O'Neal was to do that? A. No, we were going to try to promote the drilling of a well, either selling for a profit or promote a well. That made no difference. There are a number of ways you can work out a deal.

"Q. Somebody would have to drill that well before you could even get any bottom-hole money? A. If the deal took that turn and you set up that program, yes, sir; if you set up that program, yes, sir.

"Q. Somebody would have to put up the 'front money'? A. He could agree to put up the 'front money', whatever was necessary on the thing.

        *    *    *    *    *    *

"Q. I believe you stated here in your testimony yesterday that there was an understanding with John O'Neal that title to all of these properties would be taken in John O'Neal's name, is that right? A. For expediency purposes, yes, sir.

"Q. They were all conveyed to O'Neal, the Goodrich leases, isn't that right? A. Yes, sir.

"Q. Then you further stated, I believe, that the partnership that you are alleging between you and O'Neal and Randall was formed on that morning, before you came over to my office? That would be February 2, is that right? A. Yes, sir.

"Q. That, at least, is the first day that you talked with John O'Neal about it? A. Yes, sir.

"Q. And that as a result of that conference, there was an understanding that title was to be taken in O'Neal and that after he had realized and got back his money in acquiring these leases and the expenses incident to them, then you and he and Randall were to divide the profits, is that right? A. That's it; yes, sir.

"Q. In other words, you had no interest in them, except whatever was over and above that initial investment, is that right? A. Yes, sir.

"Q. Now, if something had happened and there never would have been any profits, would you have had an interest? A. Yes, sir; I would have still had an interest.

"Q. If there had not been any profit, there would not have been anything to split? A. If 'there was any loss I would have had to pay it.

"Q. I believe you said you did not discuss any loss. A. We didn't, but the inference was that we would take and pool our efforts—our mutual efforts to make a go of it. That was the understanding.

"Q. You stated yesterday you did not discuss any loss, though? A. Not in detail, the way you would put it; because as I told you there was no loss at that time anticipated, but we were going to pool all of our resources to effect a profitable venture out of it. That was the object.

"Q. At that time, when you say you went over to see Randall the day before, I believe you stated that you showed him these leases and that you were talking about the leases Goodrich had showed you? A. Yes, sir.

        *    *    *    *    *    *

"Q. I wish you would tell the court and jury in the best words you can, what you

said to John O'Neal and what he said to you about this partnership arrangement. I know you can't remember the exact words, but if you can remember. A. Well, it's pretty hard to relate it word for word, but the project was brought up—I discussed it with Randall. You see, Mr. Croley, I originally talked to Mr. Randall about this deal, not for the express purpose of interesting him or anybody else in it, but just as any ordinary oil man—you eat it, drink it and sleep it and discuss it all the time. The day previously or evening previously I had mentioned to Mr. Randall what occurred in my mind. The following morning when Randall called me into his office, he saw an opportunity to get into this deal. He told me about O'Neal.

"Q. I am asking you about what you said to John O'Neal or what he said to you, in reference to forming this partnership? A. I will try to phrase it as best I can. When Mr. O'Neal came into the conference, his greeting to me was the usual thing—'How are you, Bill', and so forth and so on. He said, 'Well, Harry tells me you got a pretty good looking deal.'

I said, 'Yes, it looks all right.' He said, 'Well, let's see what it looks like,' and we got the map on the desk and pointed to the acreage. He asked me, says, 'How much do you think it will take to handle it?' I said I didn't know, because I hadn't discussed any price with Goodrich. That perhaps was the first time Mr. Goodrich's name was mentioned in it. He says, 'Well, what do you have in mind, Bill?' I said, 'Well, John, nothing in particular, only this: Harry tells me you might be interested in working out some kind of a deal with us on this.' He says, 'Yes, we have been looking at some Stonewall County property, Harry and I,' and he says, 'It's a likely looking area; it's all right.' Then I believe it resolved around to the fact that O'Neal was interested in getting into the deal to the extent that he would advance the money.

"Q. Did he say that? A. Yes, he said it; he said it this way, Mr. Croley: That whatever moneys were necessary—we didn't know what it was going to cost—then it was generally established that O'Neal would come into the deal and make the deal a three-way deal. We would participate three ways. There was no particular advantage for me to bring Randall or O'Neal into this deal, if I wanted to take that deal myself, but somebody down the line had an idea, it might have been Randall—I presume it was—he injected Mr. O'Neal into the deal and they came to me with this proposition.

"Q. I am trying to get at how you reached this agreement. It was a verbal agreement only? A. Yes, sir.

"Q. Never has been anything in writing about this deal between you and O'Neal and Randall, is that right? A. No, I have known them fifteen or twenty years.

"Q. I am trying to find out what the contract was—it was an oral contract, that's number one? A. The contract, as far as I'm concerned, Mr. Croley, it was definitely understood between us, that Mr. O'Neal would put up whatever moneys were necessary, if he liked the deal after Goodrich was brought into the picture and explained to him just what it would take.

"Q. You wouldn't have to put up anything? A. At that particular time it wasn't necessary for me to put the initial money to acquire the project.

"Q. You didn't discuss putting up any more money at that time? A. No, not putting up any more moneys. We discussed this—that we would pool our efforts —Randall would give it a try and I would try this and John would try that and between us, we should come up with some kind of profit—a uniform venture—that's what it was—the formation of it.

"Q. You are stating your conclusions about the matter, but you can't get the exact words or language, I believe you said? A. No, sir; that is not correct. I am giving you as close to the language—if he entered into the project, Mr. O'Neal would do these things. We would pool our efforts. As far as losses were concerned, it wasn't anticipated there would be any, but if there was a loss, we would stand our proportionate part. It was anticipated if there was a loss, we would do that.

"Q. You say it was anticipated, but you didn't discuss the loss at the time that deal

came up? A. Not as specifically as that. It was inferred in a general way by Randall or myself that as to O'Neal, he wouldn't lose any money on it, if he took the deal."

█ We believe the above evidence places this case squarely within the rule announced by our Supreme Court in Sorrells v. Coffield, 187 S.W.2d 980. In that case, Sorrells claimed that he and Coffield entered into an oral agreement and formed a partnership for the purchase of 120 acres of land belonging to Butler, the purchase price to be paid by Coffield but the land to be owned by them jointly with each owning an undivided one-half interest therein if and when enough mineral interests were sold in the land to repay Coffield for the money expended by him in the purchase of the land. The facts in this case disclose that Sorrells actually made the deal with Butler for the land and Coffield was not known in the transaction until the deed was delivered, at which time his name was inserted as grantee; that thereafter, Sorrells sold for Coffield an interest in the minerals for $1,200 which was sufficient money to repay Coffield for the amount paid by him for the land. The Supreme Court, in passing upon the facts in that case, held that the contract was lacking in mutuality and was unenforceable under the statute of frauds. In other words, it held that Sorrells had no interest in the land by reason of an express trust based upon the oral agreement. It was also held that there was no partnership existing between Sorrells and Coffield. The facts in the above mentioned case are parallel to the facts in our case. O'Neal paid the entire purchase price of the leases. Howard never at any time agreed to pay any part thereof. In fact, the evidence shows that he was the agent of Goodrich in making the sale of the leases to O'Neal and that he collected from Goodrich the sum of $600 as a commission therefor. Howard's testimony is very uncertain and not at all clear as to how the money was to be raised to pay O'Neal for the money expended by him in purchasing the leases. Howard had no connection in raising the money to drill the well on the lease. The evidence discloses that the O'Neal Drilling Company drilled the wells and that the expenses of such operation were borne from money received from other parties who contributed thereto under the agreement obtained by Randall and O'Neal. Howard never put any money or any time into the project. He only agreed to use his best efforts "to promote the general welfare of the parties." Howard has not parted with anything. There is nothing for which he can claim restitution. Under the facts, O'Neal has not been unjustly or gratuitously enriched. The agreement testified to by Howard is lacking in mutuality and no consideration is shown therefor. In order to establish a parol trust in land it is necessary to show a valid and enforceable contract between the parties. Wade v. Cohen, Tex. Civ.App., 173 S.W. 1168. The requisites for such contract include, among other things, mutuality and a valid consideration.

█ Under the holding of Sorrells v. Coffield, supra, it is our opinion that there was no enforceable contract existing between the parties, therefore, we have concluded the trial court was correct in instructing a verdict in favor of O'Neal and Randall.

The judgment of the trial court is affirmed.

### On Motion for Rehearing.

█ A short time before the filing of this suit, appellant Howard attached a recording device to his telephone and called the appellee Randall and carried on a conversation with him relative to their differences. Upon the trial of this case, appellant offered in evidence such recorded conversation. To its introduction appellees objected and the objection was sustained by the court. By his sixth point appellant complains of this ruling. We have carefully considered the evidence and are of the opinion the court did not err in refusing to admit it. It shows upon its face to be an attempt to negotiate a settlement and compromise of the differences between the parties and, therefore, is inadmissible. If the evidence had been admitted it would not have changed the results. Appellees would still have been entitled to an instructed verdict.

We have again carefully reviewed the record in this case and have concluded that the disposition we made thereof in our original opinion is correct.

The motion for rehearing is overruled.