STARR v. RIPLEY et ux.

No. 10179.

Court of Civil Appeals of Texas.

Austin.

Jan. 6, 1954.

Rehearing Denied Feb. 10, 1954.

Kelley, Looney, McClean & Littleton, Willard E. Dollahon, Edinburg, for appellant.

Carter, Stiernberg, Blanton & Skaggs, Harlingen, Strickland, Wilkins, Hall & Mills, Mission, Leon Green and M. K. Woodward, Austin, for appellees.

HUGHES, Justice.

This appeal is from a summary judgment rendered against appellant H. L. Starr who had sued appellees C. A. Ripley and wife, Kathryn Taylor Ripley, to establish his ownership of an undivided one half interest in approximately 610 acres of land in Hidalgo County and for incidental relief.

We will hereafter refer to appellant as Starr and appellees as Ripley as Mrs. Ripley is not alleged nor shown to be an active party.

We will determine the validity of the summary judgment by a consideration of the allegations of Starr's pleadings and his depositions which were then on file accepting as true his testimony and the factual allegations of his pleading.

Starr alleged that in 1944 he was engaged in the business of mortgage loans, investments and real estate in Hidalgo County; that in February of that year he learned that the lands in suit might possibly be purchased at a bargain price of $25 per acre; that since he had formerly been associated with the Reserve Loan Life Insurance Company in its business of placing mortgage loans in Hidalgo County he was familiar with its methods and procedures and was personally acquainted with company personnel who passed on loan applications.

Starr, thereupon, conceived the idea that he would be able to use his knowledge of and influence with such loan and insurance company in obtaining a loan on the subject lands of at least $10,000, or about ⅔rds of the contemplated purchase price, which loan, if obtained, plus a bonus from leasing such land for oil and gas, which lease he felt certain he could sell through other connections which he had, would be sufficient to raise the bulk of the purchase price, leaving only a small difference in cash to be supplied by someone whom he

might interest in a joint purchase of the land.

Starr had previously known Ripley, had worked with him on various financial matters and was familiar with his business operations. Starr went to Ripley and told him about the land, its availability, and his plan for its joint purchase and Starr about February, 1944, orally proposed to Ripley:

That the two men would buy the land jointly but that both the contract to purchase the land and the deed conveying the title, when it might be prepared, would be taken in Ripley's name alone, but that, nevertheless, Starr and Ripley would be acquiring the land jointly; that Starr would procure from the loan insurance company a maximum loan on the land, would try to lease the land for oil and gas development, applying all sums received therefore on the purchase price and that Ripley would pay or advance the cash difference required to complete the purchase; that the land was to be acquired jointly from the beginning with respective equal interests vesting in each of them from the date of the deed but that the revenues realized from leasing, renting, farming or other operations of the land would be applied on loan payments and to reimburse Ripley, the net profits or proceeds to be equally divided between Starr and Ripley.

Ripley accepted Starr's proposal without qualifications.

During the months of February and March, 1944, Starr negotiated with prospective oil and gas lessees of the land and succeeded in obtaining their oral promises to lease the land when the owner of the land, Raymond E. Buck, executed a contract to sell; during this time Starr also worked at the other matters relating to the sale, he and Ripley going together to see Mr. Harry Ridgeway who represented the owner of the land after which Starr and Ripley went together to inspect the land and thereafter both together advised Ridgeway they wanted a contract of sale drawn. A contract of sale was drawn with Buck as seller and Ripley as purchaser and Rip-

ley at that time paid $3,000 on the purchase price and for his services in helping effect the transaction Ripley and Starr paid Ridgeway $500, each paying $250.

After the execution of the contract and pursuant to the joint enterprise and as a result of Starr's efforts, oil and gas leases were made covering some of the Buck lands and received therefor was the sum of $1,-626.62. The general warranty deed to the lands was delivered to Ripley in December, 1944, and during the interim between the contract and the deed Starr, exclusively through his own efforts, procured a $10,000 loan on the property from Reserve Loan Life Insurance Company. The closing transactions required the payment by Ripley of an additional $738.63.

Ripley took possession of the lands for himself and Starr under and pursuant to their verbal agreement and he, Ripley, has continued to occupy and make use of the premises.

From time to time, following the purchase of the lands, Starr inquired of Ripley concerning the property, farming operations thereon and the status of their accounts and would request statements, etc., but that Ripley for various reasons did not furnish such statement or accounting. These demands by Starr upon Ripley did result in the following letter from Ripley to Starr of date April 2, 1946:

"Mr. H. L. Starr
  McAllen, Texas
"Dear Mr. Starr:

"You may use this letter as confirmation and acknowledgment of the fact that you and I are partners in the ownership of a certain tract of land known as Adams Tract, being South of Donna, Texas, on the Military Highway, consisting of approximately Six Hundred (600) acres, more or less.

"Very truly yours,
                    /s/ C. A. Ripley."

Starr relied upon this letter and oral assurances from Ripley regarding the property and his interest therein until about June, 1949, when he learned that in 1947

Ripley had included this property along with other property in obtaining a loan for $35,000. The result of hearing about this loan and Ripley's continued refusal to account was the institution of this suit on June 16, 1950.

Starr's prayer was that he be decreed the owner of an undivided one half interest in the involved lands and that the record title thereto in Ripley be impressed with a trust to the extent of such interest and he prayed, as well, for an accounting and other incidental relief.

We now set forth some of the pertinent and unexplained deposition testimony of Starr which the lower court had before it and considered in rendering summary judgment against him:

"A. My agreement was that we would buy this land as a joint venture and that we could secure a loan of $10,000 on that property.

"Q. * * * Now, I will ask you, did you agree on or about August 1st, 1948 to lease said lands for oil and gas? A. We had agreed on that long before that.

* * * * * *

"A. Then I would say that I then called Rip (Ripley) and told him that I knew of this tract of land that we could buy for $25.00 straight across per acre. I told him that I thought it was a very good buy. I said, 'We can buy it and it will cost us about $15,000, and we can get a loan of ten thousand on it, I am sure, and we can lease it for from two to five dollars an acre and we will have to put up very little money.' Then Rip said, 'OK, if you think it's a good deal I will send you a check for $5,000.00.' * * *

"A. When Rip wanted to send me a check for $5,000.00 I said, 'No, we don't need any money now', I said, 'Just wait and I will let you know when'. Then I made an appointment with him to meet him up at the Donna Irrigation District, and we met there.
* * *

"Q. Tell that conversation now, that was held in the Irrigation District Office. A. I told Harry (Ridgeway) that we were interested in buying that, and he got the plat out and showed us the acreage on the plat. He told us that he thought sure that he could secure that land for us from Buck for $25 an acre. So we then got in the car with this canal rider and went down and looked over all the properties. We came back into the office, told Harry that we would take it, and on what basis, and that Rip and myself were going into it on a fifty-fifty deal, that it was a joint venture. And we told him that if he would help us get this land we would give him $500.00. And the deal was that whatever money that Rip had to put up, that the revenues from the property would go to retiring the money he had put in, and after enough revenues from that property was received, then—and Rip had cleared his original investment, then the revenues from there on would be split fifty-fifty between he and myself after the principal payments and taxes and interest had been paid.

"Q. Was it agreed that you were never to put any money on that deal, Harry? A. Yes sir, that's right.

"Q. And if your deal didn't pay out, any loss on it would be borne by Ripley? A. Well I don't remember whether that was discussed or not.

"Q. In other words, the cost of making improvements on the property, none of that was to be borne by you? A. That wasn't discussed at all.

"Q. And of course you did discuss the fact that those $10,000.00 in notes would have to be paid. A. Certainly.

"Q. Was it agreed that you would not have to pay anything on those notes? A. Not until Rip had got his money out of his original investment, then the revenues from the property would then go to retiring the interest and principal and taxes, and then

what revenues was left would be split with us fifty-fifty. * * *.

"A. I don't know just when Rip entered into the contract. He put up an escrow check of $3,000.00 when he and Buck entered into the contract, and that was sometime in April.

* * * * * *

"A. There was never any payments to be made by me. The revenues from the land was to take care of that.

"Q. And of course if there were any losses, it was discussed that he could stand them all? A. We didn't discuss about any losses. We figured that we could rent that land there for $20.00 an acre for farming, which is the prevailing rental. *. * *

"Q. Is it your testimony that you were never to put up a dollar on this deal, but get a half interest in it? A. That's right, after the revenues from the farm paid it out, and the oil rentals and minerals.

* * * * * *

"A. Our agreement was that we would buy the land, he would put up whatever necessary cash payment there was to put up. * * *

"A. And I would secure a loan for it.

"Q. But who would sign the loan papers? A. We decided Rip would take the property in his name.

"Q. And he would sign the loan papers to the company. A. Yes.

"Q. And it is your testimony that was all agreed before he ever submitted an offer, through Ridgeway, to buy the property? A. Yes. * * *

"Q. Then you go on: 'But defendant, C. A. Ripley, during the course of the transaction and negotiations hereinabove set out, had advised plaintiff that he desired to farm the land himself.' * * *

"Q. 'And it was agreed between plaintiff and defendant that he would

do so, for the benefit of plaintiff and defendant.' You mean he was to farm it and pay rent to you and himself? A. He was to farm it, and keep an accurate account of his revenues off that property, take care of the taxes, the interest and principal payments to the insurance company, and then the net was his and mine."

Accepting as true all of the allegations made by Starr together with all reasonable and favorable inferences in his behalf which can be drawn therefrom, and the testimony of Starr himself, it is our conclusion that, except as to damages, there is no genuine issue as to any material fact and that Ripley was entitled to judgment as a matter of law and hence the trial court properly sustained his motion for summary judgment under Rule 166-A, T. R. C. P.

Starr's theory of recovery is that the facts alleged are sufficient to establish, if proved, a resulting or constructive trust or some character of trust not within the provisions of Section 7, Art. 7425b, Vernon's Ann.Civ.St., the Texas Trust Act. This section of the statute provides that a trust in relation to real estate in order to be valid must be supported by a written instrument. A resulting or constructive trust is excluded from operation of the statute. Section 2 of the Act.

It is our opinion that the trust, if any, alleged or proved by the admissions of Starr is an express trust and not a resulting or constructive trust.

From our resume of Starr's pleading and admissions there emerge these three vital undisputed fact conclusions:

1. Starr did not pay nor become liable for the payment of any of the consideration moving to the grantor of the lands conveyed to Ripley.

2. The oral agreement between Starr and Ripley did not contemplate that title to the lands should be taken in the names of both but only in the name of Ripley.

3. The confidential or fiduciary relations between the parties, if any, was not pre-existing but arose solely from the single transaction relating to the purchase of the lands in suit.

Our decision is restricted to these fact conclusions and does not speculate upon what our holding would be if any one or more of such conclusions were absent or reversed.

As to conclusions (1) and (2) it is stated in Morrison v. Farmer, 147 Tex. 122, 213 S.W.2d 813, 815, that "A resulting trust arises by operation of law when title is conveyed to one person but the purchase price is paid by another. * * * In this case title to the land was conveyed to petitioner and he paid the purchase money to the grantor." It was there held that no resulting trust arose even though valuable improvements were made upon land by respondent in pursuance to an oral agreement whereby petitioner agreed to convey the land to respondent for a stated consideration.

In Tolle v. Sawtelle, Tex.Civ.App., 246 S.W.2d 916, 919, Eastland, writ ref., it was held that no resulting or constructive trust was established under an agreement between a brother and sister that if the brother bought a house and made the down payment the place would belong to the sister if she took care for life of their mother and made the monthly payments, the Court saying:

"In the instant case, the agreement between the parties was that the title to the property was to be taken in the name of appellants and no part of the consideration was paid by appellee. Appellants paid all of the consideration, that is, they paid the down payment of $2,500 and executed notes for the remainer of the purchase price. There was no agreement between the parties that the title was to be taken in the name of Mrs. Sawtelle or in the name of Mrs. Sawtelle and her brother. It will thus be seen that appellant Tolle violated no agreement with appellee at the time he purchased the property.

He did breach the agreement with his sister after he acquired title to the property.

"* * * The agreement she made with appellant and her subsequent actions in carrying out the agreement were no part of the consideration paid the grantor for the deed to appellant. * * * A resulting trust arises by operation of law when title is conveyed to one person but the purchase price is paid by another. However, such a trust arises out of the transaction and must arise at the very time when the title passes. The title was not to vest in Mrs. Sawtelle until she had complied with the agreement. *The agreement she made with her brother was not a part of the consideration paid by him for the land and does not enter into the title.*" Italics added.

In Fitz-Gerald v. Hull, 150 Tex. 39, 237 S.W.2d 256, 267, Judge Smedley in dissenting stated:

"The opinion concedes that if the agreement had been that petitioner should procure the lease for the three parties, taking title in his own name, it would have been an agreement for an express trust and not enforceable. The case is turned by the majority on that very narrow distinction, about which more will be said."

The agreement under scrutiny in that case was that three persons were to acquire oil and gas leases on certain lands, expenses and losses to be shared equally, the leases to be taken in the names of all three and one of the three violated this agreement. The Court held the essentials of a constructive trust were present, the Court saying:

"Under such state of facts when the petitioner took title to the property in his own name in violation of his promise, and of the original agreement made between the parties, he held the title to an undivided one-half interest for the benefit of, and in trust for, the respondents. This trust arose not be-

cause there was any agreement for the title to be taken in the name of petitioner, and the property to be held by him in trust for the respondents—as would be necessary to constitute an express trust—but, because under the facts, equity would raise the trust to protect the rights of the respondents, and to prevent the unjust enrichment of petitioner by his violation of his promise and duty to the respondents to take title in the name of the three of them, and for their mutual profit and advantage."

It is very difficult to catalogue the legal effect of the third fact conclusion. The Court in Fitz-Gerald quoted approvingly the following discussion of fiduciary relationships:

" 'The relationship between joint adventurers, like that existing between partners, is fiduciary in character, and imposes upon all the participants the obligation of loyalty to the joint concern and of the utmost good faith, fairness, and honesty in their dealings with each other with respect to matters pertaining to the enterprise. This is especially true of those to whom the conduct of the transaction, or the property involved therein, is intrusted. Such a party will be regarded as a trustee and will not be permitted to enjoy any unfair advantage because of his possession or control of the joint property. The mere fact that he is intrusted with the rights of his co-adventurers imposes on him the duty of guarding their rights equally with his own, and he is required to account strictly to his coadventurers; and if he is recreant to his trust, any rights they may be denied are recoverable.' 30 Am.Jur. 'Joint Adventurers,' p. 695, Sec. 34.

" 'Persons engaged in a joint adventure, or about to assume such relationship, owe to each other the utmost good faith and the most scrupulous honesty. Lind v. Webber, 36 Nev. 623, 134 P. 461, 135 P. 139, 141 P. 458, 50 L.R.A.,N.S., 1046, Ann.Cas.1916A, 1202.' (Emphasis added.)" 237 S.W. 2d at page 264.

In his concurring opinion in that case Judge Garwood added this observation:
" * * * the confidential relationship may arise in the same transaction, which is the basis of the suit, * * *."

Judge Smedley in his dissent in that case cites very strong authority for the rule that there must be a pre-existing fiduciary relationship such as executor-heir, guardian-ward, attorney-client, parent-child, etc., in order that a constructive trust be based upon a breach of trust by a fiduciary. If the oral agreement alone creates the fiduciary relationship and its breach alone is fraud then the statute prohibiting express parol trusts would be of little or no effect.[1]

Our conclusion regarding this aspect of the case is that notwithstanding the implications of what the Supreme Court stated in Fitz-Gerald on this subject that we should give effect to the Court's language quoted above which defines an agreement of the nature pleaded in this case as an express trust and hence within the prohibition of the Texas Trust Act.

Supporting this conclusion is the case of Howard v. O'Neal, Tex.Civ.App., Eastland, 246 S.W.2d 907, writ ref., N.R.E.[2] In that case the facts closely parallel those here. The oral agreement there was that Howard, Randall and O'Neal agreed to pool their time, efforts and money to acquire and develop oil leases; that title to the lease was to be taken in the name of O'Neal and hold one third in trust for

1. Reference is made to Smith v. Bolin, Tex.Civ.App., Fort Worth, 261 S.W.2d 352, writ granted and our case of Sevine v. Heissner, Tex.Civ.App., 262 S.W.2d 218, writ time unexpired, where trouble-

some questions involving this problem are presented.
2. See also the somewhat similar case of Mellette v. Hudston Oil Corp., Tex.Civ. App., El Paso, 243 S.W.2d 438, writ ref., N.R.E..

Howard. O'Neal was to furnish the money for buying the leases and was to be reimbursed from sales of portions of leases. The Court held that no trust was established basing its opinion primarily upon Sorrells v. Coffield, 144 Tex. 31, 187 S.W. 2d 980. This latter case involved a transaction occurring before the passage of the Trust Act and was determined under the less onerous Statute of Frauds. For this reason we do not more fully review the case. We do say, however, that if the oral agreement there involved was insufficient under the Statute of Frauds that such decision is persuasive that the similar agreement we have before us is invalid under the more restrictive Trust Act.

We have been cited to no case decided under the Trust Act which has sustained a trust in regard to real estate based solely on breach of relations, fiduciary or otherwise, of the character present here. Without payment of or obligation to pay any part of the consideration for the lands by Starr and without breach of an agreement to purchase in his name we are unwilling to further emasculate the Trust Act and hold that an enforceable trust is present in this case.

We do not understand that Starr by pleading or argument has taken the position that the letter of April 2, 1946, from Ripley to him is sufficient as a written instrument under Section (7) of the Trust Act and we will not, therefore, discuss this question.

The judgment of the Trial Court is affirmed.

Affirmed.

ARCHER, Chief Justice.

I respectfully dissent and would remand the cause for trial on its merits, since I believe that a genuine fact issue was raised by the appellant's pleadings, and it was the duty of the court to accept as true all of the evidence of Starr which tends to support his contention, and give him the benefit of any reasonable inference which properly can be drawn in favor of his position.

It is the duty of the court in granting a summary judgment to determine if there are any issues of fact to be tried and not to weigh the evidence or determine its credibility and thus try the case on affidavits.

On Rehearing

HUGHES, Justice.

The only point in appellant's Motion for Rehearing requiring discussion is his contention that the letter of April 2, 1946, is sufficient as a written instrument under Section (7) of the Trust Act.

It is our opinion that this writing is inadequate because of insufficient description of the lands. A further statement from the record of undisputed facts must be made in order to explain our conclusion.

Appellant sued for 610.65 acres of land, more or less, situated in Hidalgo County and described "as follows." Here is set out separate descriptions of tracts numbered one through fourteen.

The testimony of appellant's witness Ridgeway shows that these fourteen tracts consist of seven noncontiguous and separate tracts of land some of which are separated from any other tract by a distance of several miles and some of which are on the Military Highway and some of which are several miles from such highway and some of which are several miles from any tract located on such highway.

Referring to the letter of April 2, it is to be noted that only one tract is mentioned and that the county and survey in which the land lies is not given.

Conceding that extrinsic evidence is admissible to aid the description in the letter such evidence must be consistent with the nucleus of the description there given or it is inadmissible. Davis v. Kirby Lumber Co., Tex.Civ.App., Beaumont, 158 S.W.2d 888, writ ref. w. o. m.

The question arises then as to whether the letter describing one tract can be aided by parol evidence showing that fourteen, or at least seven, tracts were in-

tended instead of one. We believe the question is answered adversely to appellant in Coffee v. Manly, Tex.Civ.App., Eastland, 166 S.W.2d 377, writ ref., and in Clark v. Gregory, 87 Tex. 189, 27 S.W. 56. We quote from the opinion of Judge Gaines in the latter case:

"Where the description in a conveyance fits equally either of two things, and one is intended, parol evidence as to which of the two was intended removes the ambiguity, and is therefore legitimate. The deed, in such a case, is sufficiently descriptive to convey the thing, and the parol testimony is merely admissible in order to distinguish the thing conveyed. But when there are two tracts of land, to either of which the same description applies, and a deed purports to convey one of them by such description, and it is proposed to show, by parol testimony, not that the intention was to convey one, in particular, but that it was to convey both, the offer is not to remove an imbiguity, and to identify a thing that has actually been conveyed, but it is to enlarge the operation of the instrument, and to make it convey two tracts of lands, contrary to the expressed intention to convey one only. This is not evidence to explain a deed. It is simply evidence to add to its terms, and to make it convey more then it purports to convey. Parol evidence is not admissible for such a purpose, where the instrument comes collaterally in question."

It is unnecessary to consider further shortcomings in the description in the letter. Such description cannot be aided by the parol evidence in the record which is not only undisputed and conclusive but which is of such nature that it excludes the possibility of there ever being any admissible parol evidence to make up for the deficiency of description in the letter.

Appellant's Motion for Rehearing is overruled.

Appellee has filed a motion in which he requests that we make additional findings of fact and conclusions of law. We presume appellee means findings of undisputed facts and with this understanding we will comply with his request for additional fact findings except as otherwise indicated.

Starr wrote, but never showed to Ripley, the following statement on the bottom of Ripley's letter of April 2, 1946. "When Ripley gives back the money he put in this deal then we are fifty-fifty on the above property. /s/ H. L. Starr."

The second requested fact finding has been made in connection with our opinion overruling appellant's Motion for Rehearing.

When Starr was asked why he agreed to take title to the property in Ripley's name he testified:

"Q. It is a fact, is it not, that you then had an unpaid judgment against you? A. I think so.

"Q. That was the reason, was it? A. Could have been.

"Q. Could have been. Well, was it? A. That was one of the reasons, yes."

Based on this testimony we are asked to find that "Starr caused title to the land in question to be conveyed to Ripley with the intent to hinder or delay a judgment creditor of Starr."

We refuse to give conclusive effect to the above testimony of Starr as to his intent to hinder or delay his judgment creditor.

We have answered appellees' first requested conclusion of law in overruling appellant's Motion for Rehearing and decline to make the second because of our refusal to make the fact finding above indicated.

Appellant's Motion for Rehearing overruled.

Appellees' motion for additional findings of undisputed facts and conclusions of law granted in part and in part overruled.

ARCHER, Chief Justice.

I dissent because I believe that there are genuine issues of material fact to be determined, and that the effect of the letter is one, and the case should be reversed and remanded to the trial court for a trial on its merits.